1. "Where a surgeon enters into an agreement with a person merely to perform a certain operation, and the surgeon in violation of the contract goes further, without an emergency, and performs another operation which is unauthorized by the agreement, or by an emergency necessitating the additional operation, and injury results to the patient, the surgeon can not relieve himself from liability by showing skill and care in the other operation." Perry v. Hodgson, 168 Ga. 678
(148 S.E. 659).
2. The allegation of the petition showing that although the plaintiff, who had been operated upon by the defendant physician for appendicitis on June 6, 1939, and had thereafter, on July 18, 1939, visited his hospital to inform him that she would no longer submit to hyperdermic injections of certain medicine by another physician as instructed by the defendant, went, in response to directions of the defendant, into his operating room and got upon the operating table and allowed herself to be strapped down to enable him to examine the incision he had made in the operation for appendicitis, and, upon his representation that the only way to treat the incision which had some infection in it was to get at it through her vagina and uterus, she consented to such proposed treatment, but when the defendant began to order his attendants to *Page 332 
hand him certain surgical instruments and she became aware that he was going to operate upon her she protested against any sort of operation, telling him that she was pregnant and "for God's sake not to do anything to her that would cause her to lose her child," but that he nevertheless disregarded her protests against any operation and her request that she be allowed to consult her husband, who was waiting outside the hospital in an automobile, and he ruthlessly and violently inserted some sort of instrument into her vagina and her womb, giving it a sudden and violent whirling motion and thereby producing described injuries and dismembering the child which was in her womb, the petition not showing that the defendant was acting in any emergency arising in connection with mere treatment of the infected incision, a cause of action as for an unauthorized operation was set forth, and the petition was not subject to general demurrer. (a) The special demurrers are also without merit.
(b) The court erred in sustaining the demurrer and in dismissing the action.
Judgment reversed. Stephens, P. J., and Felton, J.,concur.
 DECIDED MAY 8, 1942.
 STATEMENT OF FACTS BY SUTTON, J.
Mrs. Joe G. Keen brought suit against Dr. Warren A. Coleman and alleged: (2) The defendant owns and operates a hospital, known as Coleman's Sanitorium, in the City of Eastman, Georgia. (3) The defendant is a practicing physician and surgeon. (4) The plaintiff went to the said hospital on or about June 2, 1939, for the purpose of having the defendant give her a physical examination and such treatment as said examination showed she needed and as recommended by him. (5) The plaintiff was pregnant when she went to said hospital and her pregnancy was the primary reason for her going there to see the defendant to have him make an examination of her and advise her, if he could, just what she should do to avoid a miscarriage. (6) At that time she was suffering from dysentery, but had never had any symptoms of appendicitis. (7) She had a miscarriage, and her family physician had advised her that if she could carry the child with which she was pregnant to its normal maturity and give normal birth to said child he thought it would improve her general health. (8) After examining her the defendant advised an operation on her for appendicitis, which was performed by him on or about June 6, 1939, in the said hospital. (9) After the operation the defendant informed the plaintiff and others that he had removed her appendix, cut and tied her tubes, and thoroughly cleaned out *Page 333 
her womb by curetting the same. (10) Within ten days after the operation the plaintiff was dismissed from the hospital and she returned to her home near Abbeville, Georgia, about twenty miles from Eastman, Georgia, where the operation had been performed. (11) Upon her discharge from the hospital the defendant sold her a bottle of medicine with instructions that she have Dr. W. P. Durham of Abbeville give it to her hyperdermically once every other day. (12) The defendant, at the time the plaintiff was discharged from the hospital, advised her to return within about ten days so that he could see how she was getting along. (13) The plaintiff returned to the hospital as directed and the defendant again examined her, telling her that she was getting along splendidly, and sold her another bottle of the same kind of medicine as that which Dr. Durham had been giving her, as aforesaid, and which made her very sick every time it was given to her. (14) Within ten days after her first return trip to the hospital she again went to the hospital but failed to see the defendant. (15) On July 18, 1939; she returned to the hospital for the sole purpose of informing the defendant that she was not going to permit Dr. Durham, or any one else, to administer to her any more of the medicine which Dr. Durham had been giving her hyperdermically, as instructed by the defendant, because it made her deathly sick every time it was given to her. (16) At that time the plaintiff was getting along splendidly and apparently rapidly recovering from the effects of the operation of June 6, 1939, and felt as though she did not need further treatment and attention by the defendant. (17) Even the incision made by the defendant in the performance of the operation was apparently almost well and was not giving the plaintiff any trouble at all, there being very little soreness. (18) When the plaintiff informed the defendant that she was not going to use any more of the said medicine he appeared to become suddenly angered and told her in a very emphatic manner to come into his operating room of the said hospital and let him examine the incision he had made upon her in the operation of June 6, 1939. (19) She obeyed his orders, went into the operating room, got upon the operating table as ordered by him, and was placed in position as for an operation, being strapped thereto by him, even though from the beginning she was vigorously protesting. (20) As a means of trying to justify his acts and conduct the defendant *Page 334 
pretended that the incision had infection in it, and that the only way he could properly treat the same was to get to it through her vagina and uterus. (21) Even though convinced that there was no infection in the incision, and that, if there had been, there was no reason why the defendant should have to treat the infection through her vagina and uterus, but since she had already placed trust and confidence in the defendant so as to permit him to operate on her on June 6, 1939, and there being that confidential relationship between her and the defendant, she submitted to him, thinking and believing that he would not take any undue advantage of her, as he did. (22) The plaintiff well knew that she was still carrying her baby in her womb, because she had felt its movement in her, even though the defendant told her that he had cleaned out her womb by curetting the same while removing her appendix. (23) After the plaintiff had left the hospital and learned that she was still pregnant and carrying her child in her womb, she was very happy because she was very anxious to give birth to said child, since her family physician had told her that in his opinion giving birth to a child would improve her physical condition. (24) As soon as the defendant got the plaintiff upon the operating table and began to order his attendants to hand him certain surgical instruments, it began to dawn upon her that he was going to perform some sort of operation upon her again. (25). Sensing what he was about to do, having her strapped down, as aforesaid, she began to beg, plead, and make violent and emphatic protests against the defendant performing any sort of operation on her, telling him that she was pregnant, and for God's sake not to do anything to her that would cause her to lose her child, but she was helpless and he proceeded with it and accomplished it anyhow. (26) The plaintiff most strenuously objected to the defendant performing any sort of operation on her, even though he thought another operation was necessary, until she could consult and talk it over with her husband, who was then just outside of the hospital sitting in his automobile, but the defendant flatly refused to grant her even this simple and reasonable request. (27) The plaintiff's sister, Mrs. Conley, went along with her until she got to the door of the operating room, intending to go therein with the plaintiff, but when the door thereto was reached it was shut in her face and admission refused her. (28) The defendant *Page 335 
totally disregarded all of the plaintiff's protests and objections made to him against his performing any sort of operation on her, and ruthlessly and violently inserted some sort of surgical instrument into her vagina and into her womb, and when inserted gave it a sudden and violent whirling motion, producing terrific and violent pains, causing great quantities of blood to flow from the plaintiff. (29) The defendant immediately upon completing his nefarious, dastardly, and unauthorized operation left the room, and as soon as his attendants removed the straps which bound the plaintiff to the operating table they also left the room, leaving her to get down from the table as best she could and get back on her the clothes which had been removed from her. (30) The plaintiff finally managed to get down from the table, unaided by any one, and get her clothes back on, no one being present, and walked, still unaided, to a room adjacent to the operating room, leaving blood in each track as she walked and which had flowed from her as a result of the said unauthorized operation. (31) As a direct result of the nerve-wrecking and tremendously weakening experience the plaintiff had just gone through with she felt weak, nervous, and fainty, about to collapse in her tracks, when she reached the said outer room, where she found a lounge or settee upon which she reclined until she could recover to some extent her composure and strength. (32) While she was resting upon the said lounge Miss Dorothy Cravey, an employee in the hospital, came to the plaintiff and gave her a puncture, injecting into her presumably some sort of medicine. (33) After resting, the plaintiff, with the assistance of her sister, Mrs. Conley, got up and walked out to the automobile where her husband was waiting for her, still leaving tracks of blood as she walked. She left the hospital without seeing the defendant any more on that day and for many days thereafter, or any one else, except the said Miss Cravey. (35) The defendant would never have gotten the plaintiff on the operating table if she could have foreseen just what he did to her. (36) The defendant, even though he well knew, or should have well known, the nature of the operation he performed on the plaintiff, as well as the effect such an operation would have on her, permitted her to leave the hospital without any attendant or any advice or instructions as to what to expect or when to return to the hospital for further attention or any sort of advice whatever. (37) *Page 336 
Being terribly weakened, frightened, and unnerved, the plaintiff got into the automobile with her husband as soon as she could and left for her home, near Abbeville, Georgia. (38) She suffered terribly on her way home, and blood was flowing so freely from her as a direct result of the said unauthorized operation on her, she having such a great desire to urinate until she had her husband stop the automobile for the purpose of permitting her to urinate. (39) When she got out of the automobile and urinated she left on the ground a long stream of blood, which had lots of fleshy strings in it. (40) She then continued on to Rhine, Georgia, where she stopped again at the home of her sister, Mrs. Oscar Stucky, where she used a slop jar and deposited therein lots of blood, and one limb of her child, which had been brutally dismembered and cut into pieces by the defendant in the said ruthless and unauthorized operation. (41) Even though suffering terribly, she left Rhine for home, hoping she could get there without stopping again, but had gone only a short distance when she became so weakened, caused from the excessive loss of blood, until she had to get a doctor, and Dr. McMillan was called and treated her while in the said automobile. (42) The plaintiff then completed her trip home, where she took her bed, and immediately called Dr. Durham of Abbeville, Georgia, to look after her. (43) When she reached home all her underclothes, and even her stockings, were completely saturated with blood that flowed from her on account of and as a direct result of said useless and uncalled for operation. (44) The Dr. Durham, when he first entered the room where the plaintiff was on her bed, said "Little girlie, there are two things I can do for you; one is I can deliver you, and the other is I can go back to town and leave you as you are." He was carrying two large satchels or cases. (45) He immediately gave the plaintiff a puncture, injecting some sort of medicine into her arm hyperdermically. (46) Soon thereafter the remaining portions of the said dismissed child were removed from the plaintiff. (47) The said child had reached that stage of development that it was well formed, and the head, arms, and legs could easily be distinguished, so that there was no doubt at all about the child being dismembered by the defendant. (48-52) The petition sets forth the pain and suffering and injuries of the plaintiff, all of which are alleged to have been directly and proximately caused by the *Page 337 
said unauthorized operation, and judgment was prayed in the sum of $5000.
The defendant demurred generally and specially on the grounds (1) that the petition did not set forth a cause of action; (2) that it can not be determined from the petition whether the plaintiff is attempting to recover for a breach of contract or for malpractice or for an unauthorized operation; (3) that the allegations of the petition do not state facts but conclusions of the pleader; and (4) that the allegations show that the plaintiff was to be given such treatment as the judgment of the defendant would warrant, and it is not alleged that the operations were not warranted or authorized by the condition of the plaintiff or that the defendant was negligent in the exercise of his judgment in performing the operations alleged. The court sustained the demurrer, and the plaintiff excepted.