Harry A. BENDIBURG, Individually and as Administrator of the Estate of Carl Bendiburg, Deceased, Plaintiff,

v.

Pamela S. DEMPSEY; Sue Terry; Nancy J. Pendergraft, Individually and as Officials of the Cobb County Department of Family & Children Services; Cobb County Department of Family & Children Services; Nancy Harrison; Medical Personnel Pool of Atlanta, Inc.; Richard Cohen, M.D.; Klaus, Cohen & Weil, Drs., Orthopaedic Associates, P.C.; Baheeg Shadeed, M.D., Defendants.

Civ. A. No. 1:87–CV–1774–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 5, 1989.

Harold Dennis Corlew, Atlanta, Ga., for plaintiff.

William C. Joy, Victoria H. Tobin, Office of State Attorney General, Bruce McCord Edenfield, Hicks, Maloof & Campbell, Alan F. Herman, Freeman & Hawkins, J. Caleb Clarke, III, Culbreth & Clarke, Earl W. Gunn, Sidney F. Wheeler, Long, Weinberg, Ansley & Wheeler, Lawrie E. Demorest, Ralph Jerry Kirkpatrick Hart & Sullivan, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

This matter is before the court on defendants' motions for summary judgment. Fed.R.Civ.P. 56. These motions will be addressed following a detailed statement of the relevant facts.

## I. STATEMENT OF FACTS.

### A. *The Parties.*

Plaintiff Harry D. Bendiburg brings this action both in his individual capacity as well as in his capacity as administrator of the estate of his son, Carl Austin Bendiburg (hereinafter "Carl"). Named as defendants are (1) the Cobb County Department of Family and Children Services (hereinafter "DFACS") and three DFACS officials, Pamela S. Dempsey, Sue B. Terry, and Nancy J. Pendergraft; (2) Sallie T. Walker, Judge Pro Tempore of the Juvenile Court of Cobb County; (3) Cobb County, a political subdivision of the State of Georgia; (4) Medical Personnel Pool of Atlanta, Inc. (hereinafter "Med Pool"), a Georgia corporation, and a Med Pool employee, Nancy J. Harrison; (5) Drs. Klaus, Cohen and Weil Orthopaedic Associates, P.C. (hereinafter "the P.C."), a Georgia professional corporation, and a member of the P.C., Dr. Richard Cohen; and (6) Adventist Health Systems/Sunbelt, Inc., d/b/a Smyrna Hospital (hereinafter "Smyrna Hospital"), a Georgia corporation, and a member of its hospital staff, Dr. Baheeg Shadeed.

The court dismissed defendants Walker and Cobb County from this action July 13, 1988.[1] The remaining defendants' motions for summary judgment will be collectively considered herein. They are alleged to be liable under plaintiff's due process claim on the theory that they conspired to cause plaintiff's constitutional injury (Count I).[2] Similarly, defendants are alleged to be liable to plaintiff for the tort of battery on the theory that effective consent was lacking and that they all acted to cause the alleged injury (Count II).[3]

### B. *Events.*

The events giving rise to this action are as follows. On September 15, 1985, plaintiff's son, Carl, was seriously injured in an automobile accident and admitted to Smyrna Hospital for treatment. Carl remained in Smyrna Hospital where he received inpatient care until his release November 9, 1985. Throughout the period of his hospitalization, Carl was treated by numerous physicians from various medical specialties. During this time, however, defendant Cohen was his primary treating physician. Among Carl's injuries was a compound fracture of the left leg. Because of the serious nature of this injury, Carl developed an osteomyelitis, or continuing bone infection, in his left leg which required the intravenous (IV) application of antibiotics to treat.

Because of this bone infection and for other reasons relating to his injuries, Carl continued to receive nursing care in his

---

1. Defendant Smyrna Hospital was dismissed from this action with prejudice by stipulation between the parties filed December 14, 1987.

2. Apparently defendant Med Pool has been excluded from plaintiff's procedural due process claim.

3. Defendant Pendergraft has been excluded from plaintiff's battery claim.

home furnished by defendant Med Pool.[4] Among the responsibilities of the Med Pool nurses, including defendant Harrison,[5] was to ensure that Carl continued to receive the proper dosage of IV medication prescribed for his continuing infection.

During the period of Carl's home care, venous access became difficult due to the collapse of Carl's peripheral veins. As a consequence, the Med Pool nurses experienced considerable difficulty in administering the prescribed IV medication to Carl causing him to miss an unspecified number of dosages.[6] For this reason, plaintiff was asked by Carl's attending physicians and the Med Pool nurses[7] to consent to the insertion of a Hickman catheter, described as "a long silicone rubber catheter which is inserted in either the subclavian (collar bone) or jugular (neck) vein and then threaded through the patient's upper venous system to the juncture of the superior vena cava and the right atrium of the patient's heart." Plaintiff's Response to Defendant Shadeed's Motion for Summary Judgment at 4. This device would allow direct administration of the prescribed medication and dispense with the need for the peripheral IVs. The Hickman catheter would not have been Carl's first central venous catheter. Approximately ten days after his initial hospitalization, Carl received a subclavian vein catheter. When this catheter failed, a second was inserted October 3, 1985 and a third two days later. Plaintiff claims this poor success rate together with the risks and available alternatives as explained to him by defendant Sha-

deed and other physicians prompted him to decline the procedure. When this information was conveyed to defendant Shadeed, he responded that he had "no problem" with plaintiff's decision.

Carl was scheduled to meet with defendant Cohen on the afternoon of November 25, 1985. On that date, apparently concerned by the difficulties encountered with Carl's IV treatment and plaintiff's refusal to consent to the Hickman catheter, defendant Harrison contacted DFACS. Speaking to an unidentified DFACS official, defendant Harrison inquired into DFACS' procedures and asked what DFACS could do about Carl's situation. She was told DFACS could intervene only if a physician would state that Carl's failure to receive the Hickman catheter was "a problem."[8] Carl's appointment with defendant Cohen for that day was subsequently cancelled and re-scheduled for Wednesday, November 27, 1985, the day before the Thanksgiving holiday.[9]

On November 26, 1985, defendant Harrison phoned defendant Cohen and informed him that she had contacted DFACS and explained what she had been told by the unidentified DFACS official. The next day,[10] after again trying to obtain plaintiff's consent to the Hickman catheter, defendant Cohen telephoned plaintiff's sister-in-law, Tersi Bendiburg, and told her, *inter alia*, a change of custody was a possibility if plaintiff continued to withhold his consent. Defendant Cohen also telephoned defendant Shadeed and told him that a court

---

**4.** Defendant Med Pool provided no care for Carl prior to his November 9, 1985 release from Smyrna Hospital.

**5.** Defendant Harrison took over the supervision of Carl's care for defendant Med Pool on November 19, 1985.

**6.** Plaintiff does not dispute this fact. He points out, however, that most of the Med Pool nurses assigned to treat Carl either could not or would not restart the IVs once they failed. A non-Med Pool nurse, June Yearwood Green of Northside Hospital, was called to Carl's home on no less than seven occasions to restart Carl's IVs.

**7.** Defendant Harrison discussed the Hickman catheter with plaintiff on several occasions between November 19 and November 25, 1985.

**8.** Though this was defendant Harrison's first contact with DFACS, a co-employee of defendant Med Pool, has testified that defendant Harrison mentioned the possibility of DFACS' involvement several days earlier. Steiner Deposition at 27–28.

**9.** It is unclear whether Carl's appointment was rescheduled before or after defendant Harrison's conversation with DFACS.

**10.** The day rescheduled for Carl's appointment with defendant Cohen.

order had been or would be obtained and asked him to insert the Hickman catheter.

At approximately noon on that day defendant Cohen instructed defendant Harrison to place a second call to DFACS at which time she spoke with defendant Dempsey. Defendant Harrison informed defendant Dempsey of the circumstances regarding Carl's infection, his need for the prescribed antibiotics, his perceived need for the Hickman catheter, and plaintiff's refusal to consent to the procedure. After conferring with her supervisor, defendant Terry, and without any further investigation, defendant Dempsey then prepared and presented to the Juvenile Court of Cobb County an *ex parte* deprivation petition pursuant to O.C.G.A. § 15–11–23, *et seq.* After hearing the matter, defendant Walker, acting as Judge Pro Tempore of the Juvenile Court of Cobb County, entered an *ex parte* order transferring temporary custody of Carl to DFACS and scheduled a hearing for the following Monday, December 2, 1985; i.e., the first available court date after the Thanksgiving holiday.

With temporary legal custody vested in DFACS, defendant Dempsey went to defendant Cohen's office to speak with him about Carl. Defendant Cohen advised defendant Dempsey that he and defendant Shadeed both agreed Carl should be immediately hospitalized for insertion of the Hickman catheter. Carl was then transported by ambulance to Smyrna Hospital followed by defendant Dempsey. Upon her arrival, defendant Dempsey executed a surgical consent form on behalf of DFACS. She then contacted plaintiff to inform him of these events. Carl stayed in the hospital overnight during which time the Smyrna Hospital nurses successfully administered Carl's antibiotics intravenously through a peripheral vein with apparently no difficulty.

Defendant Shadeed arrived at the hospital the next morning to perform the procedure. Sometime after his arrival, defendant Shadeed was shown both the juvenile court order and the executed surgical consent form. He then proceeded to implant the Hickman catheter in Carl without complications. The next day, Carl was discharged from the hospital and sent to a foster home where he remained until December 2, 1985. On that day, a probable cause hearing was held before the juvenile court. Plaintiff attended and was represented by counsel. Plaintiff was given an opportunity to request a hearing wherein DFACS would bear the burden establishing actual deprivation, but apparently declined. Custody of Carl was restored to plaintiff through a consent agreement between plaintiff and DFACS, and plaintiff had no further contact with DFACS after the hearing. Less than two weeks later, Carl suffered a massive pulmonary embolus and died. This action followed.

## II. CONCLUSIONS OF LAW.

Defendants' summary judgment motions must be granted if "there is no genuine issue as to any material fact and ... [they are] entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Defendants bear the initial burden of demonstrating that no genuine issue of material fact exists in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden then shifts to plaintiff "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. Thus, to survive defendants' motions for summary judgment, plaintiff must come forward with specific evidence of every element material to his case so as to demonstrate the existence of triable issues. *Id.*

### A. *42 U.S.C. § 1983.*

#### 1. Due Process.

Plaintiff's § 1983 claim is brought under the due process clause of the fourteenth amendment. While defendants concede that parental rights are among those protected by the fourteenth amendment, it is their position that plaintiff was not deprived of these rights without due process of law.

**1324**

a. substantive due process.

■ Substantive due process prohibits the states from engaging in certain activity regardless of the procedures used to implement them and thereby serves to prevent governmental power from being used for purposes of oppression. *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1985) (citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)); *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1499–1500 (11th Cir. 1985). A substantive due process claim may therefore be asserted in federal court regardless of the existence of a parallel state remedy. *Gilmere,* 774 F.2d at 1500.

It has been settled law for the better part of this century that governmental interference with the parent-child relationship can rise to the level of a substantive due process violation. *See Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978); *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977); *Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Meyer v. Nebraska,* 262 U.S. 390, 399–400, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923). While "[d]efining the exact scope of a substantive due process claim is by its nature an imprecise task," *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1440 (11th Cir.1985), it is known that violations giving rise to such claims are necessarily more egregious than those which give rise to simple tort actions. *Gilmere,* 774 F.2d at 1500. "[N]ot every wrong committed by a state actor rises to the level of a constitutional tort sufficient to trigger a substantive due process violation." *Lee v. Hutson,* 810 F.2d 1030, 1032 (11th Cir.1987). The most widely accepted view is that substantive due process is violated by government conduct that "shocks the conscience" or when the government engages in action "which offends those canons of decency and fairness which express the notions of justice of English speaking peoples." *Ro-chin,* 342 U.S. at 169, 72 S.Ct. at 208 (quoting *Malinski v. New York,* 324 U.S. 401, 416–17, 65 S.Ct. 781, 788–89, 89 L.Ed. 1029 (1945)); *see also Gilmere,* 774 F.2d at 1500; *Fundiller,* 777 F.2d at 1440; *Sheley v. Dugger,* 824 F.2d 1551, 1555 (11th Cir. 1987); *Everett v. Napper,* 833 F.2d 1507, 1513 (11th Cir.1987); *O'Neal v. DeKalb County,* 850 F.2d 653, 656 (11th Cir.1988). The question before the court is thus whether the evidence of record suggests state conduct that was so shocking or egregious as to give rise to a claim for damages under the concept of substantive due process. *Lee,* 810 F.2d at 1032. The court finds that it does not.

■ One of the court's most difficult tasks in properly applying the law to this case is separating the relevant facts from the overall tragedy this case presents. The kidnapping and murder of one's child by state officials under the color of state law would unquestionably present a substantive due process claim of the highest magnitude. But that is *not* what this case presents. Rather, the issue presently before the court is whether plaintiff's substantive due process rights were violated under the facts of this case when defendants caused legal custody of Carl to be removed from plaintiff for a period of five days. In analyzing plaintiff's substantive due process claim within this framework, the court must concern itself with those rights which the state may not take away. *Taylor by and through Walker v. Ledbetter,* 818 F.2d 791, 794 (11th Cir.1987). In this regard, it has been determined that parental rights cannot be taken away by the use of excessive force, *Smith v. City of Fontana,* 818 F.2d 1411, 1419–20 (9th Cir. 1987), or by officials of neighboring states. *Vinson v. Campbell County Fiscal Court,* 820 F.2d 194, 201 (6th Cir.1987). In contrast to such examples of constitutionally offensive conduct, however, the facts relevant to the instant substantive due process claim are not so shocking or egregious as to suggest that defendants' actions were taken for the purposes of oppression. The court therefore does not believe that defendants' conduct in this instance amounts to

the sort of affirmative abuse of governmental power which the substantive protections of the due process clause are designed to prevent. Accordingly, this aspect of defendants' motions for summary judgment must be GRANTED and plaintiff's substantive due process claim DISMISSED.

b. procedural due process.

In contrast to claims brought for vindication of substantive due process rights, procedural due process claims concern expectations created by state law. *Taylor*, 818 F.2d at 794. Specifically, such claims challenge the constitutional adequacy of the procedures established by the state in determining how to treat individuals in a particular instance. *Gilmere*, 774 F.2d at 1500. Thus, a party bringing a procedural due process claim must demonstrate (1) that he has suffered a deprivation in the constitutional sense, and (2) that the procedures implemented by the state to effect this deprivation were constitutionally inadequate. *Smith v. OFFER*, 431 U.S. 816, 847, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14 (1977); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). The court will analyze plaintiff's procedural due process claim in light of these requirements.

■ As the court has stated, a parent's interest in the custody of his or her child is a liberty interest entitled to constitutional protection. *Lehr v. Robertson*, 463 U.S. 248, 256–65, 103 S.Ct. 2985, 2990–95, 77 L.Ed.2d 614 (1983). There can therefore be no doubt that plaintiff has suffered a deprivation in the constitutional sense. It is equally well established, however, that a state has a legitimate governmental interest in the health, safety and welfare of the children within its borders. *Stanley v. Illinois*, 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1971). It is inevitable, therefore, that these interests will, from time to time, come into conflict. When this occurs, and when it is determined that the state's interest outweighs that of the parent, the state may, under certain limited circumstances, move to terminate the parent's right to custody. This can only be legally accomplished, however, if the state implements and follows procedures meeting the requirements of the due process clause. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). At a minimum, this requires that the parent be afforded notice and an opportunity for hearing. *Application of Gault*, 387 U.S. 1, 31–34, 87 S.Ct. 1428, 1445–47, 18 L.Ed.2d 527 (1967). In most instances, this means that the state must provide the parent an opportunity to be heard *prior* to the termination of his or her parental rights. Under certain extraordinary circumstances, however—which necessarily must be more compelling than those justifying the termination decision in the first instance—the state may legally move to terminate the parent's custody rights without prior notice or opportunity for hearing, provided a meaningful post-deprivation remedy is made available. *Smith*, 431 U.S. at 848, 97 S.Ct. at 2111. Thus,

> The necessity of quick action by the state or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the state's action at some time after the initial taking, can satisfy the requirements of procedural due process.

*Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1980).

■ Referring to the December 2, 1985 post-deprivation hearing, defendants take the position that plaintiff was afforded all the process he was constitutionally due. While the foregoing discussion makes clear that meaningful post-deprivation remedies can satisfy the requirements of the due process clause, it is equally clear that such remedies are constitutionally inadequate under any set of facts unless predeprivation remedies are unavailable:

> Post-deprivation remedies do not provide due process if pre-deprivation remedies are practicable. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 [102 S.Ct. 1148, 1158, 71 L.Ed.2d 265] (1982). Where ... a deprivation of [a constitutionally protected interest] is authorized

by an established state procedure and it is practicable for the state to provide pre-deprivation procedures, due process has been consistently held to require pre-deprivation notice and a hearing in order to reduce the possibility of a wrongful deprivation.

*Fetner v. City of Roanoke*, 813 F.2d 1183, 1186 (11th Cir.1987) (citing *Parratt*, 451 U.S. at 538, 101 S.Ct. at 1914; *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed. 2d 556 (1972); *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)). *See also Burch v. Apalachee Community Mental Health Services*, 840 F.2d 797, 801 (11th Cir.1988) (government officials abuse their state-clothed authority in depriving a person of a constitutionally protected interest when a pre-deprivation hearing is practicable). For the reasons set forth below, the court believes a question of fact exists as to the need to dispense with the pre-deprivation process.

Defendants note the State of Georgia's valid interest in protecting the welfare of the children within its borders and describe the state's approach to the interests of the parent when their interests conflict as follows:

> If a caseworker employed by DFACS is confronted with a situation where the health or welfare of a child is at stake or an emergency situation exists, DFACS' policy is to present the court with an *ex parte* order, notifying the parents once custody of the child has been obtained, and notify the parents of the post-deprivation hearing to be held within seventy-two (72) hours of the taking of custody.

Brief at 24. The question presently before the court, however, does not concern the State of Georgia's interest in child welfare nor the constitutionality of the procedures implemented to promote it. Rather, the narrow question presented by plaintiff's procedural due process claim is whether post-deprivation remedies were constitutionally adequate under the facts of this case. Put another way, the court must determine whether plaintiff has identified and presented specific evidence calling into question the need—real or perceived—to forego pre-deprivation procedures. The court believes that he has.

Defendants present evidence indicating that the decision to obtain custody of Carl on an *ex parte* basis was made only after they learned that Carl was in immediate danger of dying or suffering the loss of his leg if the Hickman catheter was not inserted and further that plaintiff refused to consent to the procedure. *See* Dempsey Deposition at 46–49. This presents a most germane issue of fact. Whether this turns out to be an arrogantly self-assured officious intermeddling in a matter where reasonable minds could disagree or a necessarily hurried and unquestionably proper response to an immediate medical emergency must be resolved upon consideration of the proof at trial. Because a question of fact exists on this point, this aspect of defendants' motions for summary judgment must be DENIED.

**2. The Private Defendants' Liability.**

Because the fourteenth amendment is directed at the states, it can be violated only by conduct that may be fairly characterized as "state action." *Lugar v. Edmondson Oil Company*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). Similarly, section 1983 provides a cause of action only for those deprived of a constitutionally protected right "under color of state law." *Id.* Thus, a showing of state action is necessary to establish both the deprivation of a fourteenth amendment right and to meet the "under color of" state law requirement of § 1983. *See Burch v. Apalachee Community Mental Health Services*, 840 F.2d 797, 802–803 (11th Cir.1988); *Carlin Communication v. Southern Bell*, 802 F.2d 1352, 1357 (11th Cir.1986).

State action requires both that the deprivation "be caused by the exercise of some right or privilege created by the state ... or by a person for whom the state is responsible," and that each party charged be a "state actor." *Id.* In the case at bar, it is clear that the alleged deprivation was caused in part by persons for whom the state is responsible; i.e., DFACS and its officials. "[T]o act 'under color of' state

law for section 1983 purposes does not require that the defendant be an officer of the state," however. *Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 186–87, 66 L.Ed.2d 185 (1980) (citing *Adickes v. S & H Kress and Company*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966)). Rather, each party charged with the deprivation need only be a person who may fairly be said to be a "state actor." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. This may be because he has obtained overt significant assistance from state officials, *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988), because he has acted in concert with state actors, *Rendell–Baker v. Kohn*, 457 U.S. 830, 838 n. 6, 102 S.Ct. 2764, 2770 n. 6, 73 L.Ed.2d 418 (1981), because his decisions and actions were overtly or covertly coerced or significantly encouraged by state officials, *West v. Atkins*, —— U.S. ——, 108 S.Ct. 2250, 2257 n. 10, 101 L.Ed.2d 40 (1988), or because his authority was delegated to him by the state. *National Collegiate Athletic Association v. Tarkanian*, —— U.S. ——, ——, 109 S.Ct. 454, 463, 102 L.Ed.2d 469 (1988).[11] It is plaintiff's primary theory of liability against the private defendants that they conspired with the state defendants "to seize custody of Carl so that the Hickman catheter could be implanted contrary to plaintiff's judgment." *See Strength v. Hubert*, 854 F.2d 421, 425 (11th Cir.1988).

As noted by the parties, the generally accepted definition of a section 1983 conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results of damage." *See Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988); *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C.Cir.1984); *Singer v. Wadman*, 595 F.Supp. 188, 270 (D.Utah 1982), *aff'd*, 745 F.2d 606 (10th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 785 (1985); *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir.1981); *Rotermund v. US Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir.1973). Thus, for plaintiff to avoid summary judgment on his conspiracy theory of section 1983 liability, he must identify and present evidence that, *inter alia*, the private and state defendants "reached an understanding" or had a "meeting of the minds" to violate his constitutional rights. *See Strength*, 854 F.2d at 425; *Dykes v. Hosemann*, 743 F.2d 1488, 1498 (11th Cir.1984), *vacated*, 776 F.2d 942 (11th Cir.1985), *reinstated*, 783 F.2d 1000 (11th Cir.), *cert. denied*, 479 U.S. 983, 107 S.Ct. 569, 93 L.Ed.2d 574 (1986); *Collins v. Walden*, 834 F.2d 961, 964–65 (11th Cir.1987); *Scott v. Dixon*, 720 F.2d 1542, 1546–47 (11th Cir.), *cert. denied*, 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984); *Cole v. Gray*, 638 F.2d 804, 811–12 (5th Cir.), *cert. denied* 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981); *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir.1979); *Baker v. McDonald's Corp.*, 686 F.Supp. 1474, 1479–80 (S.D.Fla.1987). Plaintiff fails to carry this burden.

■ Plaintiff presents evidence which indicates that the private defendants may have considered seeking a custody order as early as November 12, 1985, as well as other evidence that could support a finding that the private defendants "conspired" among themselves to overstate the immedi-

---

**11.** This case is somewhat similar to *Tarkanian* in that it mirrors the traditional state action case. "In the typical case raising a state action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the state was sufficiently involved to treat that decisive conduct as state action." *Id.* —— U.S. at ——, 109 S.Ct. at 462. Here, as in *Tarkanian*, it was the state entity which actually caused plaintiff's alleged injury. "Thus, the question is not whether [the state defendants] participated to a critical extent in [the private defendants'] activities, but whether [the state defendants'] actions ... turned [the private defendants'] conduct into state action." *Id.* In the final analysis, however, the question remains "whether the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the state." *Id.* —— U.S. at ——, 109 S.Ct. at 465 (quoting *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753)).

acy of the medical emergency which caused plaintiff to be deprived of his parental rights. None of plaintiff's evidence, however, supports the reasonable inference that this "conspiracy" involved one of the state defendants or any other state official. While plaintiff points out that the alleged "conspiratorial goal" could not have been achieved without the participation of each defendant, this fact is insufficient to demonstrate the requisite agreement between both the private and state defendants. In the words of Justice White, "It is not enough to show that the state takes certain actions in response to [a] private decision." *Rendell–Baker*, 457 U.S. at 843, 102 S.Ct. at 2772; *see also Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). Furthermore, in the context of section 1983 liability, each conspirator must have been a willful participant—not just in the ultimate objective—but in the conspiracy as well. *Dennis*, 449 U.S. at 27, 101 S.Ct. at 186; *Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605.[12] There is simply no evidence, circumstantial or otherwise, that the private defendants agreed with any of the state defendants to cause the deprivation of custody without notice and opportunity to be heard.

Citing *Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir.1979), plaintiff argues that "the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances [that the alleged conspirators] had a 'meeting of the minds' and thus reached an understanding to achieve the conspiracy's objectives." While the court does not necessarily disagree with this argument, it is nevertheless clear that a party cannot be relieved of his evidentiary burden under Rule 56 merely because his constitutional injury is alleged to have been caused by a conspiracy. "Much as a court cannot abdicate its responsibility to deny summary judgment when genuine issues of material fact exist, a court cannot circumvent its responsibility to grant summary judgment merely because a conspiracy is alleged." *Singer*, 595 F.Supp. at 274. For these reasons, the court hereby rejects plaintiff's conspiracy theory of section 1983 liability.

In the alternative to his conspiracy theory, plaintiff argues that "a private person's use of a state procedural law to effectuate a purpose not intended by state law and not permitted by the Constitution" will suffice to supply the requisite state action for section 1983 liability. In support of this argument, plaintiff cites *Motes v. Myers*, 810 F.2d 1055 (11th Cir.1987). In *Motes*, the plaintiff sought to impose section 1983 liability on a private defendant for swearing out a warrant resulting in her false arrest. Judge Ward of this district, having found state action lacking, granted summary judgment for the defendant and the court of appeals reversed. In so doing, the court, relying on *Lugar*, observed, "It would be anomalous indeed to hold a public official liable for deprivation of a party's constitutional rights under color of state law, and deny relief when a private party asserts an action pursuant to state law of similar deprivation of liberty or property." 810 F.2d at 1059.

It must first be noted that the court's holding was based entirely on a portion of the *Lugar* opinion which the Supreme Court expressly limited to deprivations arising from pre-judgment attachment of property.[13] *Lugar*, 457 U.S. at 939 n. 21,

---

**12.** The court is aware that plaintiff need not demonstrate that each defendant expressly agreed to and was aware of the details and exact limits of the illegal plan. *See Hampton*, 600 F.2d at 621. However, plaintiff still bears the burden of creating a question as to whether some sort of agreement was reached with the state defendants "to inflict a wrong against or injury upon [plaintiff]." *Id.*

**13.** Most courts have heeded this limitation and have declined to apply the *Lugar* opinion outside the context of pre-judgment attachments. *See, e.g., Deal v. Newport Datsun, Ltd.,* 706 F.2d 141, 142 (4th Cir.1983); *Dahlberg v. Becker,* 581 F.Supp. 855 (N.D.N.Y.), *aff'd,* 748 F.2d 85 (2d Cir.), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1984); *Wilson v. Pfeiffer,* 565 F.Supp. 115, 118 (S.D.N.Y.1983); *Lee v. Patel,* 564 F.Supp. 755, 759 (E.D.Va.1983); *Long v. Citizens Bank and Trust Co.,* 563 F.Supp. 1203, 1214–15 (D.Kan.1983).

The court also notes that the *Lugar* opinion represents one of a series of Supreme Court opinions addressing private party liability under

942, 102 S.Ct. at 2755 n. 21, 2756. In any event, the court finds *Motes* distinguishable. In *Motes*, the private defendant personally swore out the arrest warrant which resulted in the plaintiff's constitutional injury.[14] Moreover, the defendant was advised to swear out the warrant by a law enforcement officer and was accompanied by a second officer to the plaintiff's home after midnight to serve the warrant. These facts supported the court's conclusion that the defendant "obtained significant aid from state officials" in effecting the plaintiff's false arrest. *Motes*, 810 F.2d at 1059; *see Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753 (private defendant may be "state actor" if he obtains significant aid from state officials). For this reason, the court concludes that *Motes* falls within a line of cases not germane to the case at bar; i.e., *Scott v. Dixon*, 720 F.2d 1542 (11th Cir.1984) and *Morrison v. Washington County, Alabama*, 700 F.2d 678 (11th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

The *Scott* case involved a dispute arising out of the plaintiff's purchase of a truck from the defendant. Acting on advice given him by a state official, the defendant swore out an arrest warrant for the plaintiff. The defendant was then advised by the official—who issued the warrant—to take the warrant to the police for enforcement. Several months later, the defendant accompanied two police officers to the plaintiff's home and directed plaintiff's arrest pursuant to the warrant. The district court granted summary judgment for the defendant after concluding that he had secured the warrant as a private citizen. The court of appeals reversed finding a question of fact as to whether the defendant conspired with the state official to obtain the warrant, acted in bad faith in serving

it, and used his position as chairman of the board of commissioners to procure its execution. *Scott*, 720 F.2d at 1546. In remanding the case back to the district court, however, the court emphasized that its holding was limited to cases presenting similar facts: "We in no way intimate that every affiant to a criminal warrant engages in state action of a constitutional dimension." *Id.*

In the *Morrison* case, the plaintiff's decedent was being treated by the defendant doctor at a county hospital for diabetes when it was determined that he was also suffering from alcohol withdrawal. The defendant then instructed the hospital staff—who were county employees—to call the sheriff and have the plaintiff's decedent removed from the hospital. The officer who arrived at the hospital arrested the plaintiff's decedent after having been instructed to do so by the sheriff if the defendant doctor "approved." The plaintiff's decedent was then charged with public drunkenness and incarcerated and soon thereafter died from alcohol withdrawal. The district court granted summary judgment on the grounds that state action was lacking. In reversing, the court of appeals observed that the defendant doctor was a staff member of a county hospital, "approved" the arrest of plaintiff's decedent, and arranged for his confinement through county employees. On the basis of these facts, the court determined that the private defendant had "acted together with and obtained significant aid from state officials" in causing the decedent's constitutional injury. *Morrison*, 700 F.2d at 684.

As the foregoing discussion makes clear, *Motes*, *Scott*, and *Morrison* were cases in which it was determined that the private defendants acted concurrently with state officials in causing the plaintiffs' constitu-

---

section 1983 in the context of state pre-judgment attachment proceedings. *See, e.g., Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W.T. Grant Company*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

**14.** In the case at bar, it was the state defendants —not the private defendants—who procured the controversial custody order and who thus arguably used state procedure to effectuate a wrongful purpose. Therefore, unlike *Motes*, the private defendants in the instant case are one step removed from this key event.

tional injuries. In the instant case, it is clear that the state defendants did not become involved with the events leading to plaintiff's constitutional injury until after the actions of the private defendants had been taken. Put another way, plaintiff has at most established that the private defendants agreed among themselves to arrange for the state defendants' intervention. None of plaintiff's evidence suggests that the state defendants played any part in the private defendants' agreement and thus the *Motes* decision is inapplicable.[15]

In sum, the court concludes that plaintiff has failed to identify and present evidence demonstrating the existence of a conspiratorial agreement between the private and state defendants, or that the private and state defendants participated in the sort of joint activity necessary to supply the requisite state action. For these reasons, defendants Harrison; Cohen and the P.C.; and Shadeed's motions for summary judgment on Count I of plaintiff's complaint are GRANTED. Because the court finds that plaintiff's theories of section 1983 liability against the private defendants are not without colorable merit, defendant Shadeed's motion for imposition of sanctions pursuant to Fed.R.Civ.P. 11 is DENIED.

3. Eleventh Amendment Immunity.

The state defendants contend that DFACS is an agency of the state of Georgia and that they are therefore entitled to eleventh amendment immunity. The eleventh amendment to the United States Constitution bars suits by private parties in federal court "seeking to impose a liability which must be paid from public funds in the state treasury."[16] *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *Parker v. Williams*, 855 F.2d 763, 766 n. 2 (11th Cir.1988); *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir.1985). This immunity therefore applies to states and state officials in their official capacity as well as to other entities properly described as "arms" of the state. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977); *Fouche v. Jekyll Island State Park Authority*, 713 F.2d 1518, 1520 (11th Cir. 1983). In determining whether a particular entity is an "arm of the state" for the purposes of eleventh amendment immunity, federal courts must make reference to the state law creating and defining the entity. *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572; *Brown v. East Central Health District*, 752 F.2d 615, 617 (11th Cir.1985). "The state law provides assistance in ascertaining whether the state intended to create an entity comparable to a county or municipality or one designed to take advantage of the state's eleventh amendment immunity." *Tuveson v. Florida Governor's Council on Indian Affairs*, 734 F.2d 730, 732 (11th Cir.1984) (citing *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979)). The Supreme Court has identified several factors relevant to this analysis. They are: (1) How does state law define the entity? (2) What degree of control does the state maintain over the entity? (3) Where is the funding for the entity derived? (4) What funds would be used to satisfy any judg-

---

**15.** To the extent *Motes* does stand for the proposition that a private person's misuse of a state procedural law can supply the requisite state action, it is contrary to both Eleventh Circuit and Supreme Court authority. *See Lugar*, 457 U.S. at 940–41, 102 S.Ct. at 2755–56 (one invoking state statute without grounds to do so is not a state actor); *Scott*, 720 F.2d at 1546 (use of state procedure does not constitute state action). In such instances, the court must either reject the inconsistent precedent in favor of the Supreme Court authority, *United States v. Hobson*, 672 F.2d 825, 827 (11th Cir.1982), or follow the earlier of two conflicting cases. *Robinson v. Tanner*, 798 F.2d 1378, 1383 (11th Cir.1986).

Under either rule, the *Motes* decision would not be followed.

**16.** The eleventh amendment states only that: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." This immunity extends beyond the exact words of the amendment, however, and includes suits such as the instant case in which a state is sued by its own citizen. *Hans v. Louisiana*, 134 U.S. 1, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

ment against the entity? (5) How have the state courts treated the entity? *See Tuveson,* 734 F.2d at 732; *Fouche,* 713 F.2d at 1520; *Harden,* 760 F.2d at 1163. The court will address each of these factors in turn.

a. How does Georgia law define DFACS?

■ Defendants note initially that each county DFACS (hereinafter "the county departments") was created by and exist by virtue of state law. This observation is correct. O.C.G.A. § 49–3–1(a) provides,

There shall be in each county of the state a county department of family and children services, which shall consist of a county board of family and children services, a county director of family and children services, and such additional employees as may be necessary for the efficient performance of the welfare services of the county.

Section 49–3–1(a) is also helpful in defining the county departments' functions; i.e., to administer welfare services in their respective counties. Further guidance on this point is found in O.C.G.A. § 49–3–6. This statute provides in relevant part that each county department

Shall be charged with the administration of all forms of public assistance in the county, including home relief; indoor and outdoor care for those in need; aid to families with dependent children; old age assistance; aid to the blind and otherwise handicapped; the care and treatment of dependent, neglected, delinquent and handicapped children; and such other welfare activities as shall be delegated to it by the Department of Human Resources or by the County Commissioners. The county department shall also investigate and pass upon all applications for admission to and discharge from county institutions which provide care and treatment for indigents. If so appointed by a court of competent jurisdiction, the Department of Human Resources or the county or district department of family

and children services shall perform under the supervision of such court the function of probation officer or agent of the court in any welfare or penal matters which may be before it.

The court finds these provisions significant in view of the duties and powers vested in the State Department of Human Resources [17] by Georgia law. These include (1) the administration and supervision of public assistance and other welfare activities and services in the state; (2) the organization and supervision of the county departments for the effective administration of welfare functions; and (3) the designation of the county departments to serve as agents in the performance of all state welfare activities in the counties. O.C.G.A. § 49–2–6.

Finally, the court finds O.C.G.A. §§ 49–4–2 and 49–4–3 helpful in defining the county departments. The former statute defines the term "department" as used in the Georgia Public Assistance Act of 1965 (the Act) to include the State Department of Human Resources as well as the county departments. O.C.G.A. § 49–4–2(1). Similarly, § 49–4–3 provides that the Act "shall be administered by the Department of Human Resources, *including the county departments of family and children services* acting under the direction and supervision of the Commissioner [of Human Resources]." O.C.G.A. § 49–4–3(b). These statutes strongly suggest that the county departments are instrumentalities of the State Department of Human Resources rather than separate county entities.

b. What degree of control does the State of Georgia maintain over DFACS?

■ As noted by defendants, the degree of control over the county departments maintained by the State of Georgia through the State Department of Human Resources is extensive. First, the members of each county board are appointed by the Commissioner of Human Resources.

**17.** Which is without question an "arm of the state." O.C.G.A. § 49–2–5 (the Department of

Human Resources is declared to be an institution of the state).

O.C.G.A. § 49–3–2(a).[18] In addition, the commissioner is authorized to promulgate rules and regulations governing the selection of the chairman and vice chairman of each county board. O.C.G.A. § 49–3–2(d). Similarly, the commissioner is designated the appointing authority for the county director of each county department. O.C.G.A. § 49–3–3(a). Each director (1) is to be appointed from the State Merit System of Personnel Administration Register, *id;* (2) must post a fidelity bond "in such a manner and under such terms and conditions as may be prescribed by the Department of Human Resources," O.C.G.A. § 49–3–3(b); and (3) may be removed from office by the State Personnel Board and the State Merit System of Personnel Administration. O.C.G.A. § 49–3–7.

Second, the employees of each county department are appointed subject to the approval of the Commissioner of Human Resources and pursuant to the rules and regulations of the State Department of Human Resources and the State Merit System of Personnel Administration. O.C.G.A. § 49–3–4(a). Their salaries are likewise fixed pursuant to the salary schedule prescribed by the State Department of Human Resources. O.C.G.A. § 49–3–4(b). Finally, each employee of a county department may be transferred from one county department to another by the Commissioner of Human Resources. O.C.G.A. § 49–3–4(c). These provisions are clearly inconsistent with the notion that employees of the county departments are employed by their respective counties and suggest instead that each is a state employee under the State Department of Human Resources. *See Horne,* 152 Ga. App. 654, 263 S.E.2d 528.

Finally, the responsibilities of each county department as defined in O.C.G.A. § 49–3–6 are to be carried out under the supervision of the State Department of Human Resources. More specifically, each county department is statutorily required to administer public assistance in the respective counties subject to the rules and regulations prescribed by the State Department of Human Resources and to report to the State Department of Human Resources "at such times and in such manner and form as the department may from time to time direct." O.C.G.A. §§ 49–4–34, 49–4–54, 49–4–83, and 49–4–104; *see also* O.C.G.A. § 49–1–2. Moreover, the county departments' responsibilities are actually delegated to the county departments by the State Department of Human Resources. *See* O.C.G.A. § 49–3–6; *see also* O.C.G.A. § 49–2–6. Thus, as previously noted, the State of Georgia maintains considerable control over the county departments.

### c. Where is DFACS funding derived?

■ As noted by defendants, the county departments' funding consists of state and federal funds made available to and disbursed by the State Department of Human Resources, O.C.G.A. § 49–2–5, as well as county funds *voluntarily* provided by the county boards of commissioners. *See* O.C.G.A. §§ 49–2–9, 49–2–10 and 49–2–11.[19] No county is statutorily required "to participate in the cost of [providing] public assistance or in the cost of the administration thereof." [20] O.C.G.A. § 49–4–17. From this, the court concludes that most if not all of the funding for the county departments is derived from sources other than the counties themselves.

---

**18.** Each appointment is to be made following the recommendation and nomination of three candidates by the county board of commissioners. *Id.* This law has been interpreted as allowing the commissioner of Human Resources to reject the county board's candidates, however, and to appoint board members on his own motion. *See* 1963–65 Op.Att'y Gen. p. 256; *see also Horne v. Skelton,* 152 Ga.App. 654, 263 S.E.2d 528 (1979).

**19.** It must also be noted that the county departments are required to submit their budgets to the governing boards of their respective counties. *Id.* Because financial participation in the county departments' activities is not mandatory, however, the court presumes this requirement is designed to aid the counties in determining the extent of their voluntary participation.

**20.** The counties are apparently required to reimburse members of the county board for traveling expenses and the like, however. O.C.G.A. § 49–3–2(e).

d. What funds would be used to satisfy any judgment against DFACS?

■ No information bearing directly on this issue is available to the court. Based on the foregoing discussion, however, and with particular emphasis placed on the issues of funding and control, the presumption arises that the state would be responsible for satisfying any judgment against a county department. *See Harden,* 760 F.2d at 1164; *Fouche,* 713 F.2d at 1521. Though this presumption is by no means irrebuttable, the court cannot say "with 'a virtual certainty' that the damages would be paid from county and not state funds." *Parker,* 855 F.2d at 766 n. 2 (quoting *Edelman,* 415 U.S. at 668, 94 S.Ct. at 1358). Moreover, as has already been noted, Georgia law establishes a county department in each county of the state. With the approval of the State Department of Human Resources, however, two or more counties may unite and form a *district* department of family and children services, with a single district board comprised of individuals from each county within the district. O.C. G.A. § 49–3–1(b). This would create the possibility of multi-county liability should the county departments ultimately be found not to be state entities. While this observation does not itself lead to the conclusion that the State of Georgia would be responsible for any judgment against a county department, it is nevertheless inconsistent with the notion that the county departments are county entities.

e. How have the Georgia courts treated DFACS?

■ The most important consideration in analyzing the county departments' function and characteristics for the purposes of eleventh amendment immunity is their treatment by the Georgia courts. *Tuveson,* 734 F.2d at 732. The court must first note, however, that it is aware of no Georgia decisions addressing the issue with regard to eleventh amendment or sovereign immunity. Nevertheless, Georgia decisions addressing the broader issue of whether the county departments are state or county entities for other purposes are instructive and are therefore properly considered. *Id.*

at 733. In this regard, one Georgia appeals court has described a county department as "an instrumentality of the Department of Human Resources." *Horne v. Skelton,* 152 Ga.App. 654, 657, 263 S.E.2d 528 (1979) (construing extent of Commissioner of Human Resources' authority to appoint county department director). In so doing, the *Horne* court relied upon *dicta* found in an opinion rendered three years earlier in *Georgia Department of Human Resources v. Demory,* 138 Ga.App. 888, 888–89, 227 S.E.2d 788 (1976) ("unlike county departments of family and children services, county boards of health are not instrumentalities of the Department of Human Resources"). Neither statement controlled the outcome of those cases, however. In *Employees Retirement System of Georgia v. Baughman,* 241 Ga. 339, 245 S.E.2d 282 (1978), the opposite was true. In *Baughman,* the issue before the Georgia Supreme Court was whether county department employees are county or state employees for the purposes of the state retirement system. Placing emphasis on the extent of control maintained by the State Department of Human Resources over county department employees, the court determined that the appellees were full-time state employees entitled to creditable service under the state retirement system. *Baughman,* 241 Ga. at 340–41, 245 S.E.2d 282.

The court is also guided by numerous appellate and supreme court opinions concerning the function of the county departments in the juvenile court system. First, juvenile court petitions filed by the county departments are construed as having been filed by the Department of Human Resources "by and through" the particular county department. *See, e.g., In the Interest of R.A.S.,* 249 Ga. 236, 290 S.E.2d 34 (1982); *Jefferson v. Griffin Spalding County Hospital Authority,* 247 Ga. 86, 274 S.E.2d 457 (1981); *Brown v. Phillips,* 178 Ga.App. 316, 342 S.E.2d 786 (1986); *In the Interest of D.S.,* 176 Ga.App. 482, 336 S.E.2d 358 (1985). Second, based apparently on the above observation, the State Department of Human Resources has stand-

ing to appeal juvenile court decisions rendered against the county departments. *See, e.g., In the Interest of W.J.K.,* 188 Ga.App. 299, 372 S.E.2d 681 (1988). Finally, and of particular significance to the case at bar, when a juvenile court orders a child removed from his home and placed with a county department, legal custody of the child is vested in the State Department of Human Resources. *See, e.g., In Re R.L.M.,* 171 Ga.App. 940, 321 S.E.2d 435 (1984); *In Re M.M.A.,* 166 Ga.App. 620, 305 S.E.2d 139 (1983); *Maynard v. Berrien County Department of Family and Children Services,* 162 Ga.App. 618, 292 S.E.2d 455 (1982); *Farmer v. Union County Department of Family and Children Services,* 162 Ga.App. 66, 290 S.E.2d 163 (1982). The court finds these observations strongly indicative of a relationship between the State Department of Human Resources and the county departments independent of a separate county existence. For this reason, and in light of the other factors discussed above, the court concludes that the county departments, including the defendant Cobb County Department of Family and Children Services, were created by state law to administer the public assistance programs of the Georgia Department of Human Resources and their respective counties; that they were established in each county of the state merely to facilitate the more efficient administration of these programs; and that they are therefore state rather than county entities for the purposes of eleventh amendment immunity. Accordingly, summary judgment is GRANTED as to defendant DFACS and defendants Dempsey, Terry and Pendergraft in their official capacities as employees of DFACS. DFACS is hereby DISMISSED from this action.

### 4. Qualified Immunity.

■ The law recognizes that inevitably, state officials, in the performance of their discretionary duties, will reasonably but mistakenly conclude that circumstances justifying certain conduct are present, and that those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. *Clark v. Evans,* 840 F.2d 876, 881

(11th Cir.1988) (quoting *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987)). For this reason, defendants Dempsey, Terry and Pendergraft are entitled to qualified immunity if the law with respect to their actions was unclear at the time the cause of action arose. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1983); *Clark,* 840 F.2d at 879. On the other hand, no immunity attaches if defendants reasonably should have known that their actions violated clearly established constitutional rights. *Harlow* 457 U.S. at 818–19, 102 S.Ct. at 2738–39; *Jones v. Preuit and Mauldin,* 851 F.2d 1321, 1323–24 (11th Cir.1988) (en banc). Thus, on a motion for summary judgment based upon a qualified immunity defense, the court must determine (1) the currently applicable law; (2) whether that law was clearly established at the time of the alleged deprivation; (3) whether a reasonable official could have believed his actions were lawful in light of that law and the information possessed by the defendants at that time; and (4) whether the defendants actually engaged in conduct that violated that law. *Rich v. Dollar,* 841 F.2d 1558, 1563–64 (11th Cir.1988); *Herren v. Bowyer,* 850 F.2d 1543, 1545–46 (11th Cir.1988). The court will address these questions in turn.

The court has determined and the parties agree that the interest of a parent in the companionship, care, custody and management of his or her children is a liberty interest within the meaning of the fourteenth amendment. *See Lehr,* 463 U.S. at 256–58, 103 S.Ct. at 2990–92. Accordingly, it is axiomatic that plaintiff's liberty interest in his custody of Carl was a right of which he could not legally be deprived without due process of law. *Id.* It is likewise undisputed that a parent's interest in the custody of his or her child has been clearly established as a liberty interest under the fourteenth amendment for well over half a century. *See Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *Pierce v. Society of*

*Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925). Thus, the proper inquiry at this stage of the qualified immunity analysis is "the objective (albeit fact specific) question whether a reasonable [official] could have believed ... [defendants' actions] to be lawful, in light of clearly established law and the information ... [defendants] possessed." *Anderson,* 107 S.Ct. at 3040.

A proper discussion of this factor requires a more complete statement of the law applicable to this action. While it is true that a parent enjoys a protected liberty interest in the custody of his or her child, it is (and was) equally well established that state officials may temporarily deprive a parent of custody under narrow circumstances without prior notice or opportunity for hearing. *See Parratt,* 451 U.S. at 538–41, 101 S.Ct. at 1914–16; *see also Robison v. Via,* 821 F.2d 913, 921–22 (2d Cir.1987); *Duchesne v. Sugarman,* 566 F.2d 817, 826 (2d Cir.1977); *Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir.1983); *Sims v. State Department of Public Welfare,* 438 F.Supp. 1179, 1192 (S.D.Tex. 1977), *rev'd on other grounds,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Newton v. Burgin,* 363 F.Supp. 782 (W.D. N.C.1973), *aff'd,* 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1974). Thus, the question becomes whether there was an objectively reasonable basis for defendants to believe Carl's life, safety or welfare were threatened and further that this threat was of sufficient proportions and immediacy to warrant *ex parte* treatment.

The record shows that prior to obtaining the *ex parte* deprivation order, defendants' only source of information regarding Carl's predicament was defendant Harrison. Defendant Dempsey, the only defendant to have personally spoken with defendant Harrison at that time, testifies that she was informed by defendant Harrison that Carl

> Had a real bad infection in his leg and that he needed antibiotics given to him three times a day, and that they had been given to him intravenously but that his surface veins had collapsed and they couldn't do that any longer and they needed to insert a Hickman catheter.

Dempsey Deposition at 46–7. Defendant Dempsey testifies further that defendant Harrison informed her Carl "would either die from the infection or lose his leg [if he did not receive the prescribed antibiotics]," and that "[plaintiff] won't carry through with [insertion of the Hickman catheter]." *Id.* at 48. On the basis of this information, the decision was made to pursue an *ex parte* deprivation order. *Id.* at 48–9. Defendant Harrison testifies, however,

Q: Did you tell Ms. Dempsey in this telephone conversation if Carl did not get this Hickman catheter put in, he would die or lose his leg before Monday?

A: No.

Q: Did you ever indicate that to her in any way?

A: I did tell her that Dr. Cohen felt that this was an important procedure for him and that if he did not receive the antibiotics on a regular basis, that he had a very poor chance of not losing his leg and may die.

Q: Well, did you tell her what might happen before the weekend was over if this was not done?

A: No.

Q: You didn't say to her that he could lose his leg if it's not done immediately?

A: She didn't ask, that I know of.

Q: You didn't tell her that?

A: No.

Q: You didn't imply that in any way?

A: Not that I'm aware of. I told her what Richard Cohen told me.

Q: Did you tell her ... that you had been trying to get the father to approve this treatment?

A: I told her that it had been discussed with the father, yes.

. . . .

Q: Did you say to Ms. Dempsey or lead her to believe that this had to be done immediately, that the Hickman catheter insertion had to be done immediately?

A: No.

Q: Did she ask you what would happen if the Hickman catheter was not inserted that day?

A: No.

. . . .

Q: Well, did you indicate to Ms. Dempsey that you had discussed the implantation of the Hickman catheter with Dr. Cohen and that you and he had jointly reached this decision?

A: No.

Harrison Deposition at 173–76. Construing the foregoing in a light most favorable to plaintiff, *Samples v. City of Atlanta*, 846 F.2d 1328, 1331 (11th Cir.1988), it appears that a substantial question of fact exists as to just what information was actually available to defendants when the decision was made to seek custody of Carl on an *ex parte* basis. Because the court cannot determine whether an objectively reasonable basis for defendants' actions existed, this aspect of defendants Dempsey, Terry and Pendergraft's motion for summary judgment must be DENIED.

▆ Defendants argue alternatively that even if a question exists as to whether plaintiff's parental rights were violated, then under the undisputed facts of this case, such a violation could amount to no more than simple negligence. *See Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (simple negligence cannot violate due process clause). The same factual issue which precludes summary judgment on defendants' qualified immunity claim defeats this argument as well, however. Construing plaintiff's evidence liberally, *Samples*, 846 F.2d at 1331, a jury question clearly exists as to whether defendants' actions were taken in willful disregard for plaintiff's parental rights. Accordingly, this aspect of defendants Dempsey, Terry and Pendergraft's motion for summary judgment must be DENIED as well.

5. Supervisor Liability.

▆ Plaintiff asserts a theory of supervisor liability against defendant Pendergraft. As noted by defendants, supervisors cannot be held liable for the acts of

their subordinates solely on the basis of *respondeat superior. Fundiller*, 777 F.2d at 1443; *Geter v. Willie*, 846 F.2d 1352, 1354 (11th Cir.1988); *McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 (11th Cir.1981), *cert. den.* 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982). "[T]he mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Monell v. New York Department of Social Services*, 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611 (1977) (citing *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976)); *see also Gilmere*, 774 F.2d at 1504; *Geter*, 846 F.2d at 1355. Furthermore, it is not enough to demonstrate that the supervisory official simply "went along" with the discretionary decisions made by his subordinates. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 927, 99 L.Ed.2d 107 (1988). Rather, § 1983 liability can only attach to a supervisory official if the requisite causation is established; i.e., that an affirmative link exists between the official's acts and/or omissions and the constitutional deprivation. *Rizzo*, 423 U.S. at 370–71, 96 S.Ct. at 603–04; *Fundiller*, 777 F.2d at 1443; *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086–87 (11th Cir.1986). Thus, supervisor liability may attach where the supervisor (1) personally participated in the deprivation, *Goodson v. City of Atlanta*, 763 F.2d 1381, 1389 (11th Cir.1985); (2) expressly directed, authorized or approved the unconstitutional conduct, *Praprotnik*, 108 S.Ct. at 927; (3) established or implemented a policy or custom resulting in the constitutional injury, *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir.1986); (4) violated a duty imposed on his office by state law, *Hewett*, 786 F.2d at 1086–87; or (5) had notice of the need for improved training or supervision and nevertheless failed to take corrective action. *Fundiller*, 777 F.2d at 1086–87; *Goodson*, 763 F.2d at 1389.

Plaintiff's theory of liability against defendant Pendergraft is based upon his contention that she is the state official responsible for promulgating the policy which caused his constitutional injury; i.e., the

practice of removing children from their parents without due process of law. In support of this contention, plaintiff provides the deposition testimony of defendants Dempsey and Pendergraft. Defendant Dempsey testifies as follows:

Q: Why did you not try to call [Plaintiff] before you sought the *ex parte* order?

A: Well, I can honestly say in all my *ex parte* orders I've never contacted the parent prior to going to [juvenile] court. That was the reason why I didn't do it, just because it wasn't common practice to do that.

Q: [It was] common practice not to?

A: Right.

Q: All right. So it was in keeping with your standard practice not to contact the parent?

A: Right.

Q: Had that practice been approved by your supervisors?

A: Yes.

Q: Had it been approved by Ms. Pendergraft?

A: Yes.

. . . .

Q: Did any of your supervisors ever advise you against contacting the parents?

A: Yeah, in many instances.

Q: Who?

. . . .

A: Nancy Pendergraft, my direct supervisor.

Dempsey Deposition at 98, 150. This testimony is consistent with that of defendant Pendergraft:

Q: Now, I understand from your testimony [that] there were also instances where you sought an *ex parte* order but there was no indication that the parent would physically prevent the desired treatment. Is that correct?

A: That's correct.

Q: In those instances would there be any reason for not contacting the parent even after having made the decision, just to advise the parent what your office was doing?

A: We did not contact the parent until after it was done, period. I mean, we just didn't.

Q: Why?

A: That was just the way we proceeded.

Pendergraft Deposition at 120.

Based on the foregoing, the court concludes that defendant Pendergraft approved, authorized and implemented a policy or practice of depriving parents of their parental rights in the custody of their children without notice. Inasmuch as this is a recognized ground for supervisor liability, *Zatler*, 802 F.2d at 401, defendant Pendergraft's motion for summary judgment on this aspect of plaintiff's complaint must be DENIED.[21]

### B. *Battery.*

Count Two of plaintiff's complaint states a pendent state law tort claim for battery.[22] Under Georgia law, the intentional and unnecessary offensive or harmful touching of the person of another, no matter how slight, is held to violate a personal right and therefore give rise to an action for battery. *See Greenfield v. Colonial Stores, Inc.,* 110 Ga.App. 572, 575, 139 S.E.2d 403 (1964); *A Child's World, Inc. v. Lane,* 171 Ga.App. 438, 438, 319 S.E.2d 898 (1984); *see also* O.C.G.A. §§ 51–1–13, 51–1–14. The tort takes on added significance, however, where, as here, it is alleged to arise from the physician-patient relationship. In such instances, it is no defense to

---

**21.** At oral argument, plaintiff represented to the court that the section 1983 claim is brought in his individual capacity for violation of his parental rights as well as in his capacity as administrator of Carl's estate for some unspecified constitutional deprivation suffered by Carl. This issue has not been briefed nor has it been raised by any defendant in any summary judgment motion. Accordingly, any remaining defendants against whom this claim may lie are hereby invited to file summary judgment motions on the issue within thirty (30) days of the date of this order. The normal briefing schedule would apply and, because the facts of this case have been adequately briefed, the court's page limitation would not be waived.

**22.** Defendant Pendergraft is omitted from plaintiff's battery claim.

liability that the patient suffered no harm as a result of the examination, treatment or surgery in question or even that he benefited therefrom. Similarly, the physician cannot escape liability by demonstrating that his acts fell within the recognized standard of care. *Perry v. Hodgson,* 168 Ga. 678, 684–85, 148 S.E. 659 (1929); *Keen v. Coleman,* 67 Ga.App. 331, 20 S.E.2d 175 (1942). Thus, a party bringing such an action is relieved of the evidentiary burden normally associated with actions for medical malpractice.[23] *Mims v. Boland,* 110 Ga.App. 477, 481, 138 S.E.2d 902 (1964).

It is plaintiff's position that defendant Shadeed's insertion of the Hickman catheter in Carl constituted a battery, and that the instant defendants are liable in tort for having "aided, assisted and abetted" defendant Shadeed in the perpetration of this battery. Defendants assert their entitlement to judgment on this aspect of plaintiff's complaint on the grounds of consent.

As noted by defendants, Georgia law recognizes consent to the physical contact in question as an absolute defense to battery. *Hutcheson v. McGoogan,* 162 Ga.App. 657, 659, 292 S.E.2d 527 (1982); *see also* O.C.G. A. §§ 51–11–1, 51–11–2. In the context of the physician-patient relationship, this principle has been described as follows:

> Under proper factual conditions and circumstances, actions against medical practitioners based on assault and battery for acts arising out of their protectional conduct are recognized in Georgia. The relation of physician and patient is a consensual one, and the physician who undertakes to treat another without express or implied consent of the patient is guilty of at least a technical battery. An unauthorized and unprivileged contact by a doctor with his patient in examination, treatment or surgery would amount to a battery. In the interest of one's right of inviolability of one's person, any unlawful touching is a physical injury to the person and is actionable.

*Irwin v. Arrendale,* 117 Ga.App. 1, 5, 159 S.E.2d 719 (1967) (citing *Mims,* 110 Ga.App. at 481–82, 138 S.E.2d 902; *see also Bailey*

*v. Belinfante,* 135 Ga.App. 574, 218 S.E.2d 289 (1975). Thus, if the undisputed evidence of record establishes that the Hickman catheter procedure was carried out pursuant to valid and effective consent, plaintiff has no action for battery.

In support of their consent argument, defendants point out that legal custody of Carl at the time of the insertion of the Hickman catheter was vested in DFACS by the Juvenile Court of Cobb County and that defendant Dempsey, as DFACS' agent, was therefore authorized to consent on Carl's behalf to the procedure. Plaintiff argues, however, that (1) the order purporting to vest custody of Carl in DFACS was of no legal effect, and, in any event, (2) DFACS' custody of Carl did not carry with it authorization to consent to the procedure. The court will address these arguments in turn.

1. The Juvenile Court Order.

Plaintiff's challenge to the validity of the November 27, 1985 *ex parte* deprivation order is based on his contention that it was not entered by a properly appointed judicial officer. The court has determined, however, that defendant Walker's appointment as judge pro tempore of the Juvenile Court of Cobb County was made in compliance with Georgia law. *Bendiburg v. Dempsey,* 692 F.Supp. 1354, 1357–60 (N.D.Ga.1988). It follows, therefore, that the decision to grant DFACS' *ex parte* deprivation petition was a proper exercise of her jurisdiction. Accordingly, the court rejects plaintiff's challenge to the validity of the November 27, 1985 order.

2. Authority to Consent.

Plaintiff's alternative argument is not subject to such simple disposition. First, it is clear that the November 27, 1985 order does not itself specifically authorize DFACS to consent to surgical procedures on Carl's behalf. The order provides only that "the immediate temporary care, custody and control of [Carl] be ... placed in the Cobb County Department of Family and Children Services until further hear-

---

**23.** Though proof of causation and damages may involve a similar burden.

ing...." Second, O.C.G.A. § 15–11–43,[24] which describes the rights and duties of DFACS as Carl's legal custodian, states only that DFACS had,

> the right to physical custody of [Carl], the right to determine the nature of the care and treatment of [Carl], including ordinary medical care, and the right and duty to provide for the care, protection, training, and education and the physical, mental, and moral welfare of [Carl], subject to the conditions and limitations of the order and the remaining rights and duties of the child's parents or guardian.

Thus, neither the November 27, 1985 order nor applicable statutory law specifically provided DFACS with authority to consent to Carl's surgery. On the other hand, there can be no doubt that under both the November 27, 1985 order and § 15–11–43, DFACS would be authorized, indeed required, to consent to any form of medical procedure if Carl's life hung in the balance.

■ The Georgia courts have apparently not been confronted with the question presently before the court; i.e., the extent of a legal custodian's authority to consent to extraordinary medical treatment. Georgia cases construing other aspects of the issue provide the court with needed guidance, however. First, it is clear that the mere placement of custody by a juvenile court does not deprive a parent of all parental rights in the child. *In the Interest of KB*, 188 Ga.App. 199, 200, 372 S.E.2d 476 (1988) (citing *Jackson v. Anglin*, 193 Ga. 737, 738, 19 S.E.2d 914 (1942)). Furthermore, it has been recognized that parents generally retain certain "residual rights" in the custody of their children which cannot be abrogated by the legal custodian under § 15–11–43. *Skipper v.*

*Smith*, 239 Ga. 854, 856, 238 S.E.2d 917 (1977). This conclusion rests on the well established principle that prior to the Juvenile Court's final termination of parental rights, certain rights still exist despite the loss of physical custody. *Id.* at 857, 238 S.E.2d 917. Indeed, this is clear from the language of § 15–11–43 itself. The right to consent to adoption is such a right, *id.*, as is the right to visit with one's child. *KB*, 188 Ga.App. at 200, 372 S.E.2d 476. The court believes the right to determine whether to pursue non-emergency extraordinarily intrusive medical treatment for one's child is also a right retained by the parent under § 15–11–43. *See In re LHR*, 253 Ga. 439, 321 S.E.2d 716 (1984); *see also Parham v. J.R.*, 442 U.S. 584, 602–04, 99 S.Ct. 2493, 2504–05, 61 L.Ed.2d 101 (1979).[25]

■ This having been decided, an obvious conflict is presented: On the one hand there is the legal custodian's "duty to provide for the care ... and the physical ... welfare of the child," which clearly includes the duty to provide necessary extraordinary medical care; while on the other hand, there is the residual right to determine non-emergency extraordinary medical care retained by the parent. The extent of DFACS' authority to consent to insertion of the Hickman catheter in Carl therefore turns on Carl's need for the procedure; i.e., whether an actual emergency existed.

A question of fact precludes summary judgment on this point. Defendant Shadeed, the physician who performed the procedure, has testified as follows:

> Q: Would you have classified the surgery that you did on Carl on the 28th of November as emergency surgery?

---

**24.** Defendants also contend that DFACS was authorized to consent to Carl's surgery pursuant to O.C.G.A. § 31–9–2(a)(4) which allows one standing in *loco parentis* for a minor child to consent to surgical treatment for that child. As plaintiff points out, however, DFACS, though Carl's legal custodian, did not have this status. *See In re M.A.F.*, 254 Ga. 748, 752, 334 S.E.2d 668 (1985); *see also* O.C.G.A. § 49–5–3(11).

**25.** Reference should also be made to the Cobb County Department of Family and Children Services' procedural manual. Plaintiff's Exhibit 7.

This manual provides in relevant part, "[DFACS] has the right to sign for routine medical care once [it has] custody. Routine is described legally as regular examinations and normal physician's visits. *No surgical procedure or hospitalization is considered routine. For any surgical procedure, hospitalization or other non-routine medical service, [DFACS] must either obtain the signature or permission of the custodial parent or a court order." See* Pendergraft Deposition at 143–150.

A: I wouldn't classify it as emergency. I'd classify it as necessary.

Q: What is your definition of necessary in this context?

A: Necessary, the venous catheterization access in Carl was needed and indicated for continuous therapy of antibiotics concerning his injury and his infection, but I don't classify it as an emergency because it was not a life and death matter that he had to be operated on right then at that time.

Shadeed Deposition at 74–75; *see also* Weinberg Deposition at 43, 50; Bell Affidavit. Because a factual issue exists with regard to Carl's need for insertion of the Hickman catheter, the court is unable at this time to determine the scope of DFACS' authority to consent to the procedure.[26] Accordingly, defendants are not entitled to summary judgment on this ground.

3. Joint Tortfeasor Liability.

■ Plaintiff argues that "civil liability for ... battery is not limited to the direct perpetrator of the act charged; it extends to any person who by any means encourages or incites that act or aids and abets it." 6 Am.Jur.2d *Assault and Battery*, § 128. Defendants argue, on the other hand, that while Georgia recognizes joint tortfeasor liability, it requires a showing of malice on the part of those defendants who did not themselves commit the alleged tort.[27]

Defendants' argument is brought pursuant to Georgia's "joint wrongdoer" statute which provides in pertinent part, "In all cases, a person who maliciously procures an injury to be done to another ... is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury." O.C.G.A. § 51-12-30.[28] The word "procure" as used in this statute "does not require the lending of assistance in the actual perpetration of the wrong done by another." *Melton v. Helms*, 83 Ga.App. 71, 73, 62 S.E.2d 663 (1950). Rather, it is enough if the defendant succeeds in procuring another to commit an actionable wrong "through advice, counsel, persuasion or command," *id*, or that he "aided and abetted in the injuries received," without regard to the nature of the relationship between the parties. *Brigman v. Brenner*, 206 Ga. 222, 227, 56 S.E.2d 471 (1949); *Goddard v. Selman*, 56 Ga.App. 116, 192 S.E. 257 (1937). In the case at bar, it is clear that each defendant, either personally or through its agent,[29] wanted the Hickman catheter inserted in Carl and took certain actions to accomplish this goal through defendant Shadeed. In particular, the evidence identified and presented by plaintiff suggests that defendants Cohen and Harrison began to consider ways to subject Carl to the Hickman catheter procedure over plaintiff's objections several days prior to DFACS' intervention; that defendant Harrison contacted DFACS on two occasions and personally provided defendant Demp-

---

**26.** Compare *Davis v. Charter By-The-Sea, Inc.*, 183 Ga.App. 213, 358 S.E.2d 865 (1987). In *Davis*, the Georgia Court of Appeals reviewed the trial court's denial of the plaintiff/appellant's motion for directed verdict in a case likewise raising the issue of consent to medical treatment. In affirming the trial court, the court noted that, after the close of the plaintiff's case, a question remained as to "whether an emergency existed so that consent could be implied under [the Georgia Medical Consent Law, O.C.G.A. section 31-9-1 *et seq.*]." 183 Ga.App. at 217, 358 S.E.2d 865. Though *Davis* raised the question of medical consent in a different context, the court believes that, like *Davis*, the jury's resolution of the emergency issue in the instant case is controlling.

**27.** Obviously, this argument is not available to defendant Shadeed.

**28.** Though § 51-12-30 is most often invoked in connection with claims for tortious breach of contract, it is by its own terms equally applicable to conventional tort claims, including assault and battery. *See Brigman*, 206 Ga. 222, 56 S.E.2d 471.

**29.** Under Georgia law, "Every person shall be liable for torts committed by ... his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily." O.C.G.A. section 51-2-2. In the case at bar, it is undisputed that all defendants were acting within the scope of their employment. *See Gaylor v. Jay & Gene's Chrysler-Plymouth Dodge, Inc.*, 183 Ga.App. 255, 358 S.E.2d 655 (1987).

sey with the information which led to her decision to seek custody of Carl; and that defendant Cohen directed defendant Harrison to place the second call to DFACS and personally arranged for defendant Shadeed to insert the Hickman catheter without "worry[ing] about the family consent." *See* Steiner Deposition at 27–28; Klaus Deposition at 14–15; Harrison Deposition at 120–135, 153–157, 176; G. Bendiburg Deposition at 23–25, 49–53; Shadeed Deposition at 51–52. Drawing all reasonable inferences in plaintiff's favor, *Samples v. City of Atlanta,* 846 F.2d 1328, 1331 (11th Cir.1988), the court finds that plaintiff has pointed to evidence that defendants "procured" the alleged battery within the meaning of section 51–12–30. *See Melton,* 83 Ga.App. at 73, 62 S.E.2d 663; *Brigman,* 206 Ga. at 227, 56 S.E.2d 471. The court therefore turns its attention to the second prerequisite to joint tortfeasor liability; i.e., malice.

The Georgia courts have determined that legal "malice" as used in connection with section 51–12–30 does not require a showing of personal ill will or animosity, *Luke v. DuPree,* 158 Ga. 590, 596, 124 S.E. 13 (1924); *Nager v. Lad 'N Dad Slacks,* 148 Ga.App. 401, 404, 251 S.E.2d 330 (1978), and is to be given a liberal meaning. *Wrigley v. Nottingham,* 111 Ga.App. 404, 405, 141 S.E.2d 859, *rev'd on other grounds* 221 Ga. 386, 144 S.E.2d 749 (1965); *Perry & Co. v. New South Insurance,* 182 Ga.App. 84, 90, 354 S.E.2d 852 (1987). Acts have been found to be malicious within the meaning of section 51–12–30 "when the thing done is with the knowledge of the plaintiff's rights and with the intent to interfere therewith." *Wrigley,* 111 Ga. App. at 405, 141 S.E.2d 859. In addition, malice has been described as "any unauthorized interference, or any interference without authorization or excuse." *Architectural Manufacturing Co. v. Airotec, Inc.,* 119 Ga.App. 245, 250, 166 S.E.2d 744 (1969); *Gilbert v. Jones,* 187 Ga.App. 303, 304, 370 S.E.2d 155 (1988).

Based on the evidence previously described, the court believes that a question of fact exists as to whether defendants acted "maliciously" under Georgia law in their efforts to have defendant Shadeed insert the Hickman catheter in Carl. It is clear that defendants arranged for the procedure with knowledge of and despite plaintiff's objections. *See Wrigley,* 111 Ga. App. at 405, 141 S.E.2d 859. It is therefore for a jury to decide whether defendants' interference with plaintiff's parental rights was caused by a legitimate and reasonable concern for Carl's welfare or motivated by "malice" as defined by the courts of Georgia. Accordingly, defendants' motions for summary judgment on plaintiff's battery claim are DENIED.[30]

### 4. Good Faith.

■ Defendant Shadeed asserts his entitlement to immunity from tort liability under O.C.G.A. section 31–9–6(c) which provides,

> Any person acting in good faith shall be justified in relying on the representations of any person purporting to give consent, including, but not limited to, his identity, his age, his marital status, his emancipation, and his relationship to any other person for whom the consent is purportedly given.

Plaintiff argues that this statute is unavailable to defendant Shadeed under the facts of this case. The court believes otherwise. First, while the court has found no Georgia case addressing section 31–9–6(a), the statute is expressly made applicable to situations other than those described therein and clearly contemplates instances where, as here, one party purports to consent on behalf of another. Second, the statute, which is part of the Georgia Medical Consent Law, is to be "liberally construed." O.C.G.A. section 31–9–6(a). Finally, under the Georgia rules of statutory construction, the court is bound to give effect to the statutory language chosen by the General

---

**30.** The state defendants have not raised any defense to plaintiff's "joint tortfeasor" theory of liability. Because the alleged battery could not have occurred without DFACS' "consent" to the

Hickman catheter procedure, however, it is clear that Georgia's "joint wrongdoer" statute is no less applicable to them than to the private defendants.

Assembly. O.C.G.A. section 1-3-1; *see also Jesup v. Bennett*, 226 Ga. 606, 176 S.E.2d 81 (1970). The court therefore concludes that the statutory language of section 31-9-6(a) is sufficiently broad to encompass the facts of this case and is thus available to defendant Shadeed.

■ Plaintiff argues in the alternative that a question of fact exists as to whether defendant Shadeed was acting in good faith when he accepted DFACS' authority to consent on Carl's behalf to the Hickman catheter procedure. The court agrees.

As alluded to previously, the Georgia courts have apparently not had occasion to define the "good faith" requirement of section 31-9-6(c). In general, "good faith" means "Honesty of intention and freedom from knowledge of circumstances which ought to put [a party] upon inquiry." Black's Law Dictionary 822 (4th ed. 1968). This definition is consistent with those offered by the Georgia courts in defining "good faith" in other contexts. *See, e.g., Home Finance Co. v. Bank of Lafayette*, 99 Ga.App. 873, 881, 110 S.E.2d 57 (1959) (failure to investigate may constitute bad faith); *Ginn v. Citizens and Southern National Bank*, 145 Ga.App. 175, 177, 243 S.E.2d 528 (1978) (good faith is honesty in fact). The Georgia courts have also defined "good faith" as containing a "reasonableness" component. *See, e.g., Hartford Fire Insurance Co. v. Rowland*, 181 Ga. App. 213, 216, 351 S.E.2d 650 (1986); *Gillem v. MARTA*, 160 Ga.App. 393, 395, 287 S.E.2d 264 (1981).[31] The court believes that under any combination of these standards, a question of fact exists as to whether defendant Shadeed is entitled to the good faith immunity of the Georgia Medical Consent Law.[32]

As the court has previously noted, it is clear that defendant Shadeed was aware of plaintiff's decision to withhold his consent to the procedure and that the procedure was nevertheless conducted over his specific objections. Indeed, it appears that defendant Shadeed personally discussed the risks and benefits of the procedure with plaintiff and was made aware at that time of plaintiff's position on the subject. Shadeed Deposition at 39–42. In addition, defendant Shadeed has testified that Carl's condition did not constitute a medical emergency and that alternatives to the Hickman catheter were available. *Id.* at 74–76. Moreover, when defendant Shadeed was asked to insert the Hickman catheter in Carl, he was told by defendant Cohen to "go ahead and make plans for it and not worry about the family consent," and without question or hesitation proceeded to schedule the operation. *Id.* at 52–53. Finally, defendant Shadeed has testified that, while he reviewed the consent form attached to Carl's medical chart, he conducted the procedure without discussing the consent or juvenile court order with anyone, that he did not know who had signed the consent form on Carl's behalf, and that he relied solely on defendant Cohen's representation that the consent was valid. *Id.* at 66–72. Based on this evidence, the court concludes that a question exists as to defendant Shadeed's good faith; i.e., whether defendant Shadeed's failure to inquire further into the circumstances of DFACS' intervention was reasonable. Accordingly, defendant Shadeed's motion for summary judgment on Count II of plaintiff's complaint is DENIED as well.

## III. CONCLUSION.

In conclusion, defendants' motions for summary judgment are GRANTED IN PART and DENIED IN PART as follows. Defendants' motions for summary judgment on plaintiff's substantive due process

---

**31.** Conversely, "bad faith" has been defined as "bad purpose, bad intent, bad state of knowledge or desire." *Smith v. Maples,* 114 Ga.App. 529, 151 S.E.2d 815 (1966). It has likewise been determined that "while mere negligence is not enough to show bad faith, negligence can reach such a degree that a jury could infer bad faith therefrom." *Home Finance Co.,* 99 Ga.App. at 881, 110 S.E.2d 57.

**32.** Significantly, section 31-9-6(c) does not limit the good faith requirement to good faith reliance on the apparent authority of one party to consent on behalf of another. Rather, the statute requires good faith in all relevant respects.

claim (Count I) are GRANTED and plaintiff's substantive due process claim is DISMISSED. In addition, summary judgment is GRANTED for DFACS as well as for defendants Dempsey, Terry and Pendergraft in their official capacities. DFACS is DISMISSED from this action. As to plaintiff's procedural due process claim (Count I), defendants Dempsey, Terry and Pendergraft's motion is DENIED and defendants Harrison, Medical Personnel Pool of Atlanta, Inc., Cohen, Klaus, Cohen & Weil, P.C., and Shadeed's motions are GRANTED. As to plaintiff's battery claim (Count II), defendants' motions are DENIED. Finally, defendant Shadeed's motion for imposition of sanctions is DENIED.